UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**BRANDON T. BEYERLIN**,　　　　　　　　　　Case No. 6:15-cv-01434-KI

　　　　　　Plaintiff,　　　　　　　　　　　　OPINION AND ORDER

　　v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security**,

　　　　　　Defendant.

　　　Kathryn Tassinari
　　　Mark Manning
　　　Harder, Wells, Baron & Manning, P.C.
　　　474 Willamette, Suite 200
　　　Eugene, OR 97401

　　　　　Attorneys for Plaintiff

　　　Billy J. Williams
　　　United States Attorney
　　　District of Oregon
　　　Janice E. Hebert
　　　Assistant United States Attorney

Page 1 - OPINION AND ORDER

    1000 SW Third Ave., Ste. 600
    Portland, OR 97204-2902

    Lars J. Nelson
    Special Assistant United States Attorney
    Office of the General Counsel
    Social Security Administration
    701 Fifth Ave., Ste. 2900 M/S 221A
    Seattle, WA 98104-7075

        Attorneys for Defendant

KING, Judge:

Plaintiff Brandon Beyerlin brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying his application for disability insurance benefits ("DIB"). I affirm the decision of the Commissioner.

## BACKGROUND

Beyerlin filed an application for DIB on September 5, 2012, alleging disability as of July 26, 2012. The application was denied initially and upon reconsideration. After a timely request for a hearing, Beyerlin, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on February 3, 2014.

On March 7, 2014, the ALJ issued a decision finding Beyerlin was not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on June 2, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

Beyerlin, according to the ALJ, has the following severe impairments: obesity, degenerative disc disease, status post laminectomy with spinal cord stimulator implant, and degenerative joint disease with history of arthroscopic surgery for medial meniscus tear. The ALJ found these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. Given these impairments, the ALJ concluded Beyerlin retained the residual functional capacity ("RFC") to perform sedentary work, except that he can only occasionally stoop, crouch, crawl, kneel, climb, and balance. He should avoid more than occasional overhead reaching bilaterally. Given this RFC, Beyerlin could not perform his past work but he could perform other work in the national economy, such as document preparer, survey worker, and small products bench assembly.

## FACTS

Beyerlin was 42 years old at the time of his alleged disability onset. He is a high school graduate with a lengthy work history as a traffic maintenance technician for the City of Eugene. Before his alleged disability onset, he was in a motorcycle accident which caused back pain. Also before his alleged onset date, he had an L4-5 disc arthroplasty in 2010 and an L3-4 laminectomy in April 2012.

PAGE 5 - OPINION AND ORDER

In June 2012, at his appointment with his primary care physician Lisa Emond, M.D., he reported chronic knee and back pain. He had gained 30 pounds in the past year, despite walking three to four miles four days a week, kayaking on the weekends, and not overeating. Dr. Emond prescribed oxycodone, but told him he needed to look for a job that was easier on his back. Tr. 333. Two weeks later, Beyerlin told Dr. Emond he was on temporary disability due to his chronic back and neck pain. He wanted to talk about retraining for a position he could do. Dr. Emond prescribed Celexa and Norco and told him that his back condition would not permit him to do the kind of heavy work he was trying to do. Tr. 328.

An MRI on July 24, 2012 revealed wide decompression of the thecal sac at L3-4, but no evidence of recurrent disc herniation or nerve root compromise, and no identifiable central or foraminal stenosis. Tr. 372. It showed disc degeneration and an annular tear in the L5-SI disc. Tr. 387.

Beyerlin stopped working at the end of July 2012. He sought treatment from the NeuroSpine Institute, reporting pain of 8-9/10. Alicia Feldman, M.D., felt Beyerlin should remain off work as it would be difficult for him to return to his job. She recommended bilateral L4-5 and L5-S1 facet joint injections with IV sedation as well as a home exercise program. Tr. 392.

In August, Dr. Emond completed a work assessment for him. She noted his good exercise habits and normal activities of daily living. He reported pain with movement of his thoracolumbar spine, and his paraspinal muscles exhibited spasms. His flexion, extension, and rotation of his lumbosacral spine was decreased, and the straight-leg raising test of both legs was positive. He could not stand on his toes, his ankles were weak, his gait and stance were

abnormal. Tr. 318. She opined that he could not bend, twist, stoop, crawl, climb or kneel, and could not lift more than 25 pounds. He also could not pull or push more than 25 pounds. Tr. 319.

Beyerlin obtained facet joint injections later that month, without any relief. Dr. Feldman prescribed MS Contin, and rare Vicodin for breakthrough pain. He rated his pain at 5/10 with radiation into his thighs; he was taking Vicodin twice a day and oxycodone twice a day.

Beyerlin told Dr. Emond he was doing as well as could be expected, that he felt no side effects from his medications, but he felt constant generalized pain. She prescribed Morpine, with oxycodone for breakthrough pain.

Beyerlin returned to Dr. Feldman in late September 2012. He reported pain of 6-7/10, without significant relief from the injections. The pain worsened with sitting, driving and standing. Dr. Feldman had no other nonsurgical options for Beyerlin, and she suggested he talk to Scott Kitchel, M.D., about possible surgery.

Dr. Kitchel noted Beyerlin felt he was doing well in terms of the back pain he suffered two years before. Beyerlin could arise easily from a chair, he stood erect, his gait was normal, his motor strength was 5/5, and there were no subjective sensory deficits. Dr. Kitchel released Beyerlin to full activities as tolerated, but noted continued work-up with Dr. Feldman for radicular symptoms.

Beyerlin's car was rear-ended in October and he reported increased pain in his lower back. On examination, his lumbar spine was tender, with spasms of the paraspinal muscles. Flexion, extension, and rotation of the lumbosacral spine was decreased. He could not stand on his toes or heels and his gait and stance were abnormal.

PAGE 7 - OPINION AND ORDER

In November 2012 the City of Eugene informed Beyerlin that it could not accommodate him in his position of maintenance worker and that there was no other position to which he could be reassigned. Tr. 252. A few days later, Beyerlin returned to Dr. Feldman reporting increasing pain at 5/10 mostly in his low back with periodic radiation down both legs. Dr. Feldman proceeded with a discogram on L3-4 and L5-S1. She gave him fentanyl patches, instead of MS Contin, and Norco for breakthrough pain. The discogram showed single-level pain reproduction at L5-S1 and Dr. Kitchel thought Beyerlin would be a good candidate for L5-S1 arthrodesis.

Following up in December 2012, Beyerlin reported pain at 5-6/10, constant in nature, and exacerbated by bending, twisting, sitting, walking, exercise, standing and lying down. Upon examination, Beyerlin rose from seated to standing with slight difficulty, he walked with a normal gait, and could walk on his heels and toes. Devon Parks, PA-C, recommended evaluation by Dr. Kitchel for further surgery or, if surgery was denied, spinal cord stimulation. About a week later, at his appointment with Dr. Emond, Beyerlin reported feeling preoccupied with his symptoms, but he was not feeling tired. Dr. Emond increased his Celexa as Beyerlin felt it was helping some.

In January 2013, Parks reported that Beyerlin's insurance company had denied his request for fusion surgery. Beyerlin continued to demonstrate slight difficulty rising from a seated position, and he walked with a slightly unsteady gait. Parks switched Beyerlin's medications to OxyContin and Percocet. Tr. 473. Carmina Angeles, M.D., Ph.D., examined Beyerlin, who reported pain at 5/10 which was significantly affecting his quality of life. He was not feeling tired and his neck was supple. His thoracolumbar spine demonstrated tenderness on palpation at L5-S1, and his lumbosacral spine demonstrated decreased lordosis, limited flexion and

PAGE 8 - OPINION AND ORDER

extension, and the straight-leg raising test of the right leg was positive. He could not heel or toe walk, he limped, and his deep tendon reflexes were abnormal. Dr. Angeles did not recommend appealing the insurance denial as he did not meet the requirements for a fusion. She recommended a spinal cord stimulator trial.

Meeting with Gregory Moore, M.D., Beyerlin reported sharp, electric and stabbing pain that was constant and at a level of 6/10. Beyerlin conceded medication "allows him to remain functional but he does not wish to be on the medication if possible." Tr. 479. They discussed a spinal cord stimulator trial.

At his appointment with Dr. Emond in early March 2013, Beyerlin reported his chief complaints as right knee, shoulder, and elbow pain. She recommended ice and working on diet and exercise.

Dr. Moore implanted the trial spinal cord stimulator later that month. Beyerlin reported 100% of his painful areas were covered with 70% pain relief. He was very pleased overall and thought he was able to do more than he could normally, although he still felt breakthrough pain in his low back.

A late-March MRI of his thoracic spine showed a small right paracentral focal disk protrusion at T8-T9 and T9-T10 without cord or root impingement. Tr. 538. Dr. Angeles noted Beyerlin was unable to heel walk, and he was limping. She recommended thoracic spinal cord stimulator paddle placement. A few days later, Beyerlin underwent a T10 inferior laminectomy and placement of the thoracic spinal cord stimulator paddle. Beyerlin reported feeling well. His gait was normal.

During this time, Beyerlin also sought treatment for knee pain. Beyerlin reported average activity level, and exercising three to four times per week. Tr. 604. He was very pleased with the surgery done more than two years before on his left knee, saying he felt no pain in his left knee. Brick Lantz, M.D., thought Beyerlin had a medial meniscal tear on the right knee and recommended arthroscopic surgery. At his pre-op appointment, Beyerlin reported an average activity level, exercising three to four times a week. His hobbies included boating, camping, and church activities. Tr. 599. After the surgery, he displayed excellent range of motion, but he had slipped and hyperflexed his knee earlier which caused pain. Dr. Lantz aspirated the knee in advance of Beyerlin's traveling to Oklahoma. Beyerlin continued to complain of swelling in June 2013, so Dr. Lantz aspirated the knee. The doctor also fitted Beyerlin with a below-knee compression stocking to help with the swelling.

Beyerlin reported 100% coverage after the spinal cord stimulator was programmed. When asked if the pain was improved, he responded, "Yes!" Tr. 739. He thought he received 80% pain relief with 100% of the painful areas covered. His medications were effective and did "not cause any significant side effects." Tr. 732. He had been more active, riding his bike and planned to start water aerobics. Pain was intermittent in nature, and was alleviated by medications and the stimulator. Parks decreased Beyerlin's OxyContin.

In June 2013, Beyerlin complained of fatigue to Dr. Emond and asked for a testosterone replacement shot. Tr. 756. To Parks, the physician's assistant at the NeuroSpine Institute, Beyerlin reported pain at 3/10, thought he was doing well on a decreased OxyContin dose, and indicated he had been more active; he did note worsened pain if he did too much. Parks

PAGE 10 - OPINION AND ORDER

observed Beyerlin rise from seated to standing without difficulty and walk with a normal gait. Tr. 729.

A month later, in August 2013, Beyerlin continued to rate his pain level at 3/10 and as intermittent. He felt more pain after cleaning out a rental house of his. Parks noted Beyerlin's pain at 4/10 in October, that Beyerlin's activities improved with the use of medication and the spinal cord stimulator. The stimulator did not cover all the pain in his low back, however. Beyerlin had a normal gait with no limp. Similarly, in November, Beyerlin noted pain at 4-5/10, that medications helped, but that he felt more pain when he tried to be active. Parks thought his stimulator could be reprogrammed, and that Beyerlin would benefit from an exercise program such as yoga, pilates, or tai chi.

When Beyerlin saw Dr. Emond in November 2013, he reported chest pains and shortness of breath with activity. He wanted a referral to OHSU for his back and he complained about gaining weight. His gait and stance were normal. Dr. Emond discussed weight management and thought the heart-related symptoms were reflux, neck pain or muscular-related. At his appointment with Parks in December, Beyerlin reported pain at 4/10, that it interfered with his sleep, but he had a normal gait with no limp. Parks scheduled Beyerlin for a CT myelogram of his cervical spine, and an SI joint injection. Dr. Emond noted Beyerlin's back pain was stable, although it continued to be a problem, but he had now progressed to "frank diabetes." Tr. 748. He had not noticed any fatigue. Dr. Emond encouraged lifestyle changes, urged diet changes, and weight loss. The x-ray of his chest was normal, but he did have cervical stenosis.

In 2014, Dr. Moore of the Neurospine Institute noted Beyerlin's low back pain despite the stimulator. He recommended bilateral L2-L5 medial branch blocks and, if they worked, to

PAGE 11 - OPINION AND ORDER

consider radiofrequency denervation.  The doctor set Beyerlin up for weight loss and wellness given his obesity and lack of exercise.  Tr. 779.  The CT myleogram revealed mild multi-level degenerative changes.  Tr. 775.  When Parks saw Beyerlin in February, he noted Beyerlin had a normal gait with no limp.

## DISCUSSION

Beyerlin challenges the ALJ's treatment of his testimony and rejection of his treating physician's opinion.

I.      Beyerlin's Testimony

Beyerlin testified that he could not work because of the pain in his knees and low back.  He could not bend over, lift or squat, and he felt shooting pain down his legs.  He testified his fingers fell asleep due to neck problems, and that he had been diagnosed with diabetes.  He said he did not use the spinal cord stimulator because it only helped the pain down his legs and not his low back pain.  He lived in a one-level house with his wife and three teenage children.  He did not attend their school activities and he no longer visited anybody.  He no longer went hunting.  He emptied the dishwasher, cooked dinner, he read as long as he could stay awake, and occasionally spent time on his computer.  He spent his days standing and sitting in his recliner.  Around late 2013, he remembered walking two or three times a week for less than half a mile.  He usually slept four hours a night.  He reported taking so much pain medication that he felt "halfway asleep most of the day."  Tr. 89.

The ALJ concluded Beyerlin's testimony about the intensity of his symptoms was not entirely credible.  First, he thought Beyerlin's activities suggested a somewhat greater level of

functioning than he alleged.  Beyerlin's medical records also reflected improvement in his conditions.  Finally, the ALJ found Beyerlin exaggerated the side-effects from his medication.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  *Id.*  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).  General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence.  *Id.*  "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[1]

Beyerlin argues his daily activities are not so vigorous that they could serve as a reason for finding him not credible.  Daily activities could be relevant for one of two purposes.  A

---

[1]The Commissioner suggests the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence.  Def.'s Br. 9, n.6.  The Ninth Circuit has rejected her argument.  *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

PAGE 13 - OPINION AND ORDER

claimant's daily activities might be so substantial such that they equate to an ability to work. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Alternatively, the activities might be inconsistent with testimony purporting to be limited in some way. *Id.* Here, the ALJ found Beyerlin's activities suggested a "somewhat greater level of functioning" than Beyerlin alleged. Beyerlin was riding his bike and walking at one point during the relevant time, and he took care of all of the household chores including cleaning the house and cooking dinner. He could sit to travel to Oklahoma and, contrary to Beyerlin's suggestion, there is no evidence Beyerlin reclined the entire trip there. I agree with Beyerlin that these activities are not egregiously contradictory to his testimony, but there is enough evidence for the ALJ to find Beyerlin is capable of doing more than he testified to. The ALJ's conclusion is supported by inferences reasonably drawn from the record, even if it is susceptible to a different interpretation. *Molina*, 674 F.3d at 1110.

Additionally, medical evidence is a relevant factor in determining the severity of the pain and its disabling effects. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). Beyerlin disputes the ALJ's reading of the medical record. Again, although the record is susceptible to a different interpretation, the medical records support the ALJ's reading of the records which reveals that implantation of the spinal cord stimulator was successful. His gait was normal, he reported 80% pain relief, and his pain was intermittent. His pain level decreased to 3/10. His medical providers encouraged exercise. As the ALJ noted, "[s]uch evidence and medical recommendation strongly suggests that the claimant was capable of greater functioning than alleged." Tr. 71.

Finally, Beyerlin's testimony about the purported side effects of his medication, and his contradictory statements to his providers, is a clear and convincing reason to question Beyerlin's

PAGE 14 - OPINION AND ORDER

credibility. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (ALJ may use "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid"). The ALJ pointed out the fact that Beyerlin never reported fatigue as a side effect of his medications. Indeed, he repeatedly indicated that the medications were effective and did not cause any side effects. Although Beyerlin disputes the relevance of this contradiction, arguing fatigue is not one of his alleged impairments, exaggerated testimony is a permissible credibility factor. Beyerlin also points to two places in the record where he complained about fatigue, but one of those records reflects Beyerlin's worsened fatigue since stopping testosterone replacement and was not a complaint about medication side-effects. Tr. 756. The other is but one complaint of fatigue over several years of treatment and does not undermine the ALJ's conclusion which is based on substantial evidence in the record. Tr. 376.

In sum, the ALJ gave clear and convincing reasons, supported by substantial evidence, to find Beyerlin's testimony less than credible.

II.     Medical Evidence

In December 2013, Dr. Emond opined Beyerlin's impairments would limit him from standing and walking less than two hours in an eight-hour day, and sitting for less than six hours in an eight-hour day. She thought he could only occasionally lift ten pounds, and could never lift anything more than ten pounds. She thought he would be unable to maintain a normal work schedule more than two days per month. She reported that Beyerlin suffered drowsiness and fatigue from his medications.

The ALJ rejected Dr. Emond's opinion, finding it to be inconsistent with Dr. Emond's treatment notes and not substantiated by clinical evidence. The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2.

Beyerlin argues Dr. Emond's opinion is uncontradicted. He disputes that the agency's consulting physician's opinion can constitute a contradicting opinion when the agency's doctor was unaware of records after March 2013. He also contends a dispute about functional abilities is not the kind of conflict contemplated by the law.

As the Commissioner points out, familiarity with the medical records is one factor to consider in assessing contradicting medical opinions. 20 C.F.R. § 404.1527(c)(6). Here, making reasonable inferences based on the record, the ALJ concluded the state agency physician, Neal Berner, M.D., identified functional limitations which were consistent with the medical record and with Beyerlin's activities. Beyerlin's condition only showed improvement after Dr. Berner

issued his opinion.  Tr. 739 (improvement in pain with stimulator); Tr. 729, 727 (pain at 3/10); Tr. 724 (pain at 4/10); Tr. 714 (4/10 pain).  Although Beyerlin required aspiration of his right knee, he also could rise out of a chair without difficulty and walk with a normal gait.  Tr. 729.

As to Beyerlin's second objection, a conflict about functional limitations is the kind of discrepancy which can make opinions contradictory, thereby leading to application of the specific and legitimate standard.  *See Widmark*, 454 F.3d at 1066 (conflict between stage agency reviewing physician and orthopedist on manipulative limitations).

Here, the ALJ gave specific and legitimate reasons for discounting Dr. Emond's opinion.  As the ALJ pointed out, Dr. Emond's noted fatigue only once, and that was in the context of testosterone treatment not medication side-effects.  In fact, at the appointment closest in time to her completion of the functional capacities form, while discussing Beyerlin's diabetic condition, Beyerlin denied noticing any fatigue.  Tr. 748.  Further, Dr. Emond's opinion is inconsistent with the numerous examinations in 2013 where Beyerlin displayed a normal gait.  As for her treating records, Dr. Emond treated Beyerlin on four occasions in 2013.  Once for knee and elbow pain, once for testosterone shots, and once for chest pain (at which she noted his gait was normal).  Finally, in December 2013, at the appointment closest in time to her completion of the functional capacities form, she reported Beyerlin's "stable" back pain that does continue to be a problem, but he reported no sleep problems and had a normal stance and gait.  Dr. Emond recommended weight loss and exercise.  An ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "conclusory, brief, and unsupported by the record as a whole[.]"  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *see also*

*Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (it is permissible to reject check-off reports from physicians that do not contain any explanation of the bases for the conclusions).

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this   25th    day of July, 2016.

                                                  /s/ Garr M. King
                                                 Garr M. King
                                                 United States District Judge